WARWICK, appellant, and DAWES and others, respondents.

1. A usurious mortgage may, by the act of the parties to it, be so purged of the illegal taint, that it will stand as a legal security against the mortgagor and all persons subsequently acquiring an interest under him.

2. Such purgation would not affect an existing second mortgage: but where the holder of such second mortgage foreclosed it, making the first mortgagee a party, and treating the first mortgage as valid, and, at the sale, the property was sold subject to such first mortgage, *held*, that the purchaser at such sale could not set up the original usurious taint against such first mortgage.

On appeal from a decree of the Court of Chancery, dismissing complainant's bill.

The opinion of the Chancellor is reported in 10 *C. E. Green* 188.

*Mr. Joel Parker*, Attorney-General, for appellant.

*Mr. Kingman*, for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

This is a foreclosure bill, founded on a mortgage given on the 10th of October, 1860, by Benjamin Marlatt to one Samuel F. Butcher, to secure the payment of $800, and which was subsequently assigned to William Warwick, the complainant. To this bill, the only defence interposed is, that this instrument was given upon a usurious loan.

The further material facts in proof are these: That a second mortgage was given by the above named Marlatt, on these same premises, to one Cutter, who foreclosed it, and, at the sale, the appellee, John Dawes, became the purchaser. In this foreclosure suit, in which this sale took place, Warwick, as assignee of the first mortgage, was made a defendant. He did not appear, but as the bill in that case did not question his rights, the decree, it is admitted, did not have any hostile force against him.

Touching the fact of usury, the proofs appeared to this court so demonstrative, that, upon the argument, the counsel of the appellees was not called upon. Therefore, it is now assumed, that the mortgage in suit was originally corrupted by this illegal ingredient. But two questions, after this

assumption, remain : first, whether this transaction was purged from the usury by a subsequent arrangement between the mortgagor and mortgagee ; and, second, this being the case, whether such purgation can affect the purchaser, Dawes, he buying under the second encumbrance.

With regard to the first inquiry, evidence was offered on the part of the complainant, to show that, shortly before the sale in the foreclosure suit under the second mortgage, he made a settlement of certain accounts with Marlatt, the mortgagor, whereby, in consideration of a credit given on certain judgments held against him, it was agreed, that all objection to his security, on the ground of usury, should be waived, and that it should stand as the evidence of a legal debt. The sum thus credited was much larger than the bonus constituting the usury.

Of the making of this arrangement, there is no denial ; but it is said, that it was made by a person who was not the agent of Marlatt for that purpose, and this was the view entertained in the Court of Chancery. But, upon a careful examination of the proofs on this head, I cannot concur in this result. The evidence shows that Marlatt had, in a certain suit which he had brought in the Court of Chancery, obtained a decree for a large amount of money, against Warwick the present complainant; that Warwick held in his hands counter claims to a considerable amount, and that it was left by Marlatt to his solicitor to make an adjustment and ascertain the balance. This settlement was made between the solicitor and the complainant; and on that occasion, the mortgage now in suit, together with the judgments already mentioned, was presented ; and the complainant then agreed to deduct from the amount due upon his judgments, the sum of $235, upon condition, that in consideration of such deduction, his mortgage should stand as purged of usury. These terms were accepted, and accordingly, the complainant cancelled his judgments, and the solicitor endorsed on the bond, secured by this mortgage, an acknowledgment that there was

due on it the sum of $800, principal, and signed this acknowledgment as the attorney of Marlatt.

These are admitted facts, the sole controversy being, as to the authority of the solicitor. This gentleman was sworn, and stated the affair with characteristic clearness. He says he agreed, on the grounds just mentioned, "to waive the objection against the mortgage on account of usury." He was the solicitor of Marlatt in the chancery suit, the decree in which was the subject of arrangement; and he further testified: "I was acting for Mr. Marlatt, and in waiving the claim for usury, I supposed I had his authority for what I did. * * * I was acting under my general power as solicitor for Mr. Marlatt, guided by what I understood him to say in the conversation I had with him, in view of a settlement with Warwick; that was the only power I had in reference to it." The denial of the authority thus claimed, was but faintly made. Mr. Marlatt was a witness, and was interrogated on this subject. The question was, referring to this affair: "At that time, had not Mr. W. (his solicitor) full power to settle all questions in difference between yourself and William Warwick?" The answer was: "Not without consulting me, I suppose." And, again, being asked: "Had not Mr. W. authority to make that endorsement for you, as your solicitor?" he replied: "He did that without my consent, or my knowing anything about it."

From this testimony, my inference would be in favor of the existence of the authority in question. But it does not appear to me to be worth while to pause to see which side of the scale holding this testimony outweighs the other. This, as I think, is a matter of no consequence, for Mr. Marlatt is not in a position to dispute the fact, that a competent agency existed. He is estopped by his own conduct from raising this objection, for he ratified the act which is now sought to be repudiated. Upon this point, it would be difficult to present a case more entirely conclusive. The facts are not in dispute. Mr. Marlatt, as a witness says, that upon seeing his solicitor, the first time after the settlement, "I told him I was very

sorry he had done a thing of that kind." And the solicitor, in describing the same interview, thus states what passed: "Some little time after that, Mr. Marlatt called at my office, and I told him what I had done in making a settlement with Mr. Warwick; he expressed himself as not satisfied with what I had done; said he thought I had gone too far in waiving or giving up the bond and mortgage on account of usury. I told him that I supposed from what he had previously said to me, that he was willing I should make that settlement with Mr. Warwick, if I thought it best, and that if I had not supposed so, I would not have done it." And this is all that was said or done on the subject. The affair, then, is this: The solicitor supposing himself empowered, makes a settlement for Marlatt, who, when informed of it, expresses some dissatisfaction, but does not intimate that he disowns the act; he retains the benefits of the settlement, and leaves the other contracting party in the belief that it is binding: who can doubt, that this conduct is, in law, a ratification of all that was done? It does not seem to me, that any legal proposition can be plainer. The matter does not appear to have been presented, in this aspect, to the attention of the Chancellor: if it had been, I have no doubt that the circumstances would have been regarded as possessed of the legal efficacy now ascribed to them. The effect to be given to the transaction is, that the bond and mortgage now in question were purged of all usury. Marlatt, the mortgagor, agreeing to waive, with respect to them, all defence on this ground.

The legal operation of such an agreement was then, I think, to leave these instruments perfectly valid and effective for all purposes, so far as Marlatt and his subsequent grantees are concerned. The legal doctrine on that subject is not at all obscure or uncertain; it needs no extended discussion, as the principle now apt, is clearly stated by Chief Justice Green, sitting in this court, in the case of *Brolasky* v. *Miller*, 1 *Stockt.* 812. The rule there propounded is, that although the statute declares a mortgage, founded on a usurious contract, utterly void, such instrument, nevertheless, is voidable

only by the mortgagor, and those claiming under him, and invested with his rights. Unless the mortgagor, or those who, in this respect, have the right to represent him, chooses to interpose the statute as a defence, the mortgage will remain a legal encumbrance upon the land embraced in it. If the title is conveyed on the condition that the grantee will pay the money secured in the mortgage, upon a failure to comply with such condition, the mortgage will be enforced in equity. I can see, therefore, no reason why, if the parties, by their agreement, purge the mortgage of its illegal element, it will not stand good against the parties to such agreement, and all persons who, subsequently, derive any interest from them. It is true, that in the case of *Miller* v. *Hull,* 4 *Denio* 104, it was said, that there was no way whereby the parties could render the original, usurious security, legal; but the question does not appear to have received much consideration, there being another ground of decision, which was entirely decisive. It is certain the cases cited do not sustain the rule for which they are vouched, and the rule itself does not seem to be defensible on general principles. The substantial right which the law accords is, that the parties may extract from the act done its illegal element; all the rest is mere form, and it can make no difference whether the reformation of the transaction is evidenced by the original instrument, or by a new one. As a mortgagor can pass over to his grantee the land so burthened by a usurious mortgage that such encumbrance becomes incontestable, I am unable to comprehend how it can be claimed that he cannot agree that such mortgage, the illegality of it having been eliminated, shall stand good against himself, and against all persons afterwards acquiring his rights. And this is the effect that I give to the purgation of the present instrument; after such act, I do not think, that the mortgagor, Marlatt, can object to it on the ground in question, nor that any one else, standing in no better position than he does, can so object. And the general principle from which this result thus reached has been deduced, will be found, I think, to be entirely supported by

the following authorities: *Elliot* v. *Wood*, 53 *Barb*. 285; *Green* v. *Kemp*, 13 *Mass*. 515; *Hartley* v. *Harrison*, 24 *N. Y*. 170; *Russel* v. *Pistor*, 3 *Seld*. 171; *Post* v. *Dart*, 8 *Paige* 641; *Sands* v. *Church*, 2 *Seld*. 347; *Ballard* v. *Raynor*, 30 *N. Y*. 197.

The effect of this conclusion on this first point then, is this, that the purchaser at the sale under the foreclosure of the second mortgage cannot claim a right, as the representative of Marlatt, the owner of the equity of redemption, to set up, against the mortgage now in suit, the defence of usury. At the time of the sale, as we have seen, Marlatt had no such right, having lost it by the agreement to validate the instrument; the purchaser, therefore, in his name, cannot claim such right.

But, it is not to be denied, that this purchaser, the appellee in this case, stands, in this respect, on higher ground; for he represents not only the interests which were inherent in Marlatt at the time of the sale, but also those which had been conveyed to the second mortgagee, the complainant in the foreclosure suit. This presents the second subject of inquiry: What effect, if any, did the purgation of the first mortgage have upon the rights of the second mortgagee? The solution of that problem seems to me free of all difficulty. The legal and equitable rights of the second mortgagee could not be affected by anything which the mortgagor and the first mortgagee might choose to do. As to the second mortgagee, the first mortgage being usurious, was a nullity, and it could not, without the consent or act of the second mortgagee, be called into existence so as to affect him. In point of law, the second mortgage, was the first lien upon the property; and the effect, therefore, of the agreement on the part of the mortgagee, making the first mortgage valid, was to make it a lien subordinate to this second encumbrance. After the validation of the first mortgage, in the transfer already described, a court of equity would have enforced it, but would have postponed it to the rights of the second mortgagee. The consequence is, that if no controlling circumstances had intervened, this

paramount right of the second mortgagee would have passed to the present appellee, the purchaser at the sale under the foreclosure of this second mortgage. Now I think, upon looking carefully into the facts of this case, and at the status of the respective parties at the time of the foreclosure sale, it will be clearly seen that such controlling circumstances existed. It will be remembered that the question now is, what were the rights which the purchaser at that sale got by virtue of his claim to represent the second mortgagee? In order to test that, we have but to ascertain what were the rights of this second mortgagee, himself.

If he had been the purchaser at his own sale, could he have set up, in this present suit, the defence of usury? I do not see how such a claim could be justified, either on the general principle of the law, or the particular equity of this case. In the first place, this second mortgagee, in his foreclosure bill, made this first mortgagee a party defendant, and by so doing, so far as he was concerned, waived of record all defence to such first mortgage, to the extent that it represented an actual loan. The rule is, that he who asks equity, must do equity, and the consequence is, a complainant cannot ask to have a usurious mortgage annulled in his favor by a decree, without tendering the amount due. There is no pretence in the present case, that this second mortgagee called in question, in his chancery suit, the validity of this first mortgage; he treated it as a first, valid encumbrance on the property; and, if nothing further had been done, and he had become the purchaser, it does not seem possible, that after such a course of legal proceedings, he could have been permitted, in a subsequent suit, to challenge the first mortgage as usurious. But the case against such a claim goes far beyond this. At the sale, the solicitor of this second mortgagee gave public notice that the property was sold subject to this first mortgage, and that the principal sum of $800 was due upon it. A similar notice was given by the attorney, of Mr. Marlatt, the owner of the equity of redemption; and it was

also proved in the case, that the purchaser, Mr. Dawes, who now insists on this defence of usury, inquired, before he purchased, what was the amount due upon that encumbrance, and that after the sale, he promised to pay it as soon as he got his deed. It is thus apparent, that the appellee got this property for just $800 less than he would if this mortgage had not then been regarded as a legal lien on it; and that the second mortgagee failed, from the same cause, to realize this same amount on his decree, which, it appears, was not satisfied by the sale. The injustice of such a result must condemn it, and, as I think, must go far towards demonstrating that it cannot be the legitimate outcome of the statute, which was designed to protect the borrower. In this case, if the purchaser can succeed in his defence against that mortgage, it is painfully obvious that he is allowed to violate the condition on which he acquired this property, as such condition was understood and consented to by himself, and by all the other parties interested, and this to the loss of him whom the act was framed specially to befriend. By the repudiation of this security, it is the purchaser, and not the borrower, that is benefited, for the effect of the sale, under the conditions stated, was to leave the second mortgage, by force of which the sale was made, measurably unsatisfied. Nothing can be more inequitable than the claim of this purchaser : he asks the court to help him to violate the fair understanding on which the sale was made, and his own express promises, in order that he may retain money which does not of right belong to him, and for which he has given absolutely nothing in the way of consideration. In my opinion, the equitable principle already stated, and the circumstances attending this sale, preclude the appellee from maintaining, successfully, so unfair a position.

I think the decree should be reversed, and a decree given for the complainant below, for the amount of principal and interest due on his mortgage.

As it appears, however, in the case, that the appellant brought his suit with undue precipitation, and that his con-

duct in that respect was oppressive, I think he should have costs neither here nor in the Court of Chancery.

Decree unanimously reversed.